2016 ND 144

**Helen REBEL, Plaintiff and Appellant**

v.

**Rodney Allen REBEL, Defendant and Appellee.**

**No. 20150066.**

Supreme Court of North Dakota.

July 20, 2016.

Thomas M. Jackson, Bismarck, N.D., for plaintiff and appellant.

Gary D. Ramsey, Dickinson, N.D., for defendant and appellee.

VANDE WALLE, Chief Justice.

[¶ 1] Helen Rebel appealed from an amended divorce judgment entered after remand distributing the parties' marital property. We conclude the district court adequately explained its disparity in dis-

tributing the parties' marital property and the distribution is not clearly erroneous. We further conclude the court did not abuse its discretion in awarding interest on Rodney Rebel's delayed cash payments to Helen Rebel. We affirm.

I

[¶ 2] Helen and Rodney Rebel were married in 1989 and owned a farming and ranching operation. In 2010, Helen Rebel sued for divorce. They had two children, one of whom was a minor at the time of the divorce. After an initial trial, Helen Rebel appealed a judgment granting her a divorce from Rodney Rebel, awarding her primary residential responsibility and child support for the minor child, and distributing their marital property.

[¶ 3] This Court affirmed the district court's child support award but reversed and remanded its property distribution, holding the court had not adequately articulated reasons justifying its disparity in favor of Rodney Rebel. *Rebel v. Rebel*, 2013 ND 116, ¶ 15, 833 N.W.2d 442. In remanding the case, a majority of this Court explained:

The district court articulated some reasons for granting an unequal distribution. But, the fact that the land was acquired on "very generous terms" from Rodney Rebel's parents does not explain giving the greater distribution to Rodney Rebel when the land was acquired during the marriage, both parties were purchasers, and the district court found "[b]oth parties' income and effort contributed to the increase in the marital estate." *See Ulsaker v. White*, 2006 ND 133, ¶ 12, 717 N.W.2d 567 ("[T]he origin of property is not the sole or, necessarily, the controlling factor under the *Ruff–Fischer* guidelines.") (citation omitted). The distribution was based on an assumption that the difference was

$356,769.00. The district court has not adequately articulated reasons justifying a greater disparity in favor of Rodney Rebel. Moreover, by failing to either award interest or to compute the present value of the delayed payments, the actual disparity is greater than the $356,769.00 identified by the district court.

Because the district court has not adequately articulated reasons justifying its calculated $356,769.00 disparity in favor of Rodney Rebel, and Helen Rebel "receive[d] property which is clearly worth less than the value ascribed to it by the trial court, [we] cannot determine whether the resulting property distribution is equitable." *Welder [v. Welder]*, 520 N.W.2d [813, 816 (N.D.1994)]; *see also Steckler [v. Steckler]*, 519 N.W.2d [23, 25 (N.D.1994)]; *Sateren [v. Sateren]*, 488 N.W.2d [631, 633 (N.D.1992)]; *Lucy [v. Lucy]*, 456 N.W.2d [539, 542 (N.D.1990) ]. We remand the case to the district court to reconsider the property distribution.

*Rebel*, at ¶¶ 14–15. We therefore remanded to the district court to adequately explain any disparity favoring Rodney Rebel and to address its failure either to award interest or to compute the present value of the delayed payments to Helen Rebel.

[¶ 4] On remand the case was assigned to a different judge because the previous judge had retired. The district court permitted the parties to present additional evidence regarding valuation of the property at a three-day trial. After that trial, the court found the parties' net marital estate as of May 2, 2012, the date of their divorce, was $1,994,086.30. The court found the value of the real property was $1,302,000, valuing the farmland at $1,210,000 and the marital home at $92,000. The court also found the value of the livestock was $569,750, of the crops

and feed was $135,471, and of the farm machinery was $319,065.

[¶ 5] The district court allocated $279,832.17 in assets and $13,111 of debt, for a net award of $266,721.17, to Helen Rebel, mainly consisting of the marital home, not subject to a mortgage, and other monetary assets. The court allocated $2,281,077.50 in assets and $553,712.37 of debt, for a net award of $1,727,365.13, to Rodney Rebel, mainly consisting of the farmland and assets related to the farm operation. Based on these values, the district court recognized that if it were to make an "equal" division of the property, Rodney Rebel would "owe" Helen Rebel $730,321.98. The court found, however, that $410,207 constituted a fair and equitable cash payment under the circumstances of this case.

[¶ 6] In the initial divorce judgment, the previous judge had awarded Helen Rebel $512,534.78, of which Rodney Rebel had a balance owing of $410,207 at the time of the remand. On remand, the court reaffirmed and adopted this remaining amount. The court found the property division was not unequal or inequitable because "if any higher cash payment amount is ordered, Rodney's farm operation will not cash flow," and "this would certainly lead to liquidation and the adverse tax consequences and sale costs associated with liquidation." The court also found that 4.5 percent was a fair and appropriate interest rate and that Rodney Rebel could admittedly "cash flow" an annual payment of $33,607.85. The court therefore ordered him to make annual payments of about $33,530 to Helen Rebel, allowing him seventeen years to pay the $410,207 cash award with a 4.5 percent interest rate. The court also ordered that "[n]either party shall be required to pay any spousal support to the other now or[ ] at any time in the future since[ ] the issue was never raised on appeal." An amended judgment was entered distributing the parties' marital property and assigning the debts.

II

[¶ 7] Section 14-05-24(1), N.D.C.C., requires a district court make an equitable division of the parties' marital estate in a divorce action. "In making an equitable distribution of marital property, a court must consider all of the parties' assets." *Rebel*, 2013 ND 116, ¶ 7, 833 N.W.2d 442 (quoting *Kosobud v. Kosobud*, 2012 ND 122, ¶ 6, 817 N.W.2d 384). After including the parties' marital assets and debts in the marital estate, the court considers the *Ruff–Fischer* guidelines in distributing the assets:

[T]he respective ages of the parties, their earning ability, the duration of the marriage and conduct of the parties during the marriage, their station in life, the circumstances and necessities of each, their health and physical condition, their financial circumstances as shown by the property owned at the time, its value at the time, its income-producing capacity, if any, whether accumulated before or after the marriage, and such other matters as may be material.

*Rebel*, at ¶ 7 (quoting *Kosobud*, at ¶ 6).

[¶ 8] The district court is not required to make specific findings on each *Ruff–Fischer* factor but must explain the rationale for its decision. *Kostelecky v. Kostelecky*, 2006 ND 120, ¶ 13, 714 N.W.2d 845. A long-term marriage supports an equal property distribution. *Wagner v. Wagner*, 2007 ND 101, ¶ 11, 733 N.W.2d 593. However, a property distribution need not be equal to be equitable, and the district court must explain any "substantial disparity" in its distribution. *Rebel*, 2013 ND 116, ¶ 7, 833 N.W.2d 442. In *Rebel*, at

¶ 8, we also discussed offsetting periodic payments to preserve the family farm:

> "We have upheld the distribution of farm assets to one spouse with an offsetting monetary award to the other spouse." *Gibbon v. Gibbon*, 1997 ND 210, ¶ 7, 569 N.W.2d 707 (citation omitted). But, "[w]e have consistently held that periodic cash payments without interest awarded as part of a property distribution must be discounted to present value in determining whether or not the distribution is equitable." *Welder v. Welder*, 520 N.W.2d 813, 816 (N.D.1994) (quotation and citations omitted); *see also Horner v. Horner*, 2004 ND 165, ¶ 18, 686 N.W.2d 131; *Steckler v. Steckler*, 519 N.W.2d 23, 25 (N.D.1994); *Sateren v. Sateren*, 488 N.W.2d 631, 633 (N.D.1992); *Lucy v. Lucy*, 456 N.W.2d 539, 542 (N.D.1990); *Pankow v. Pankow*, 371 N.W.2d 153, 157–58 (N.D.1985).

[¶ 9] The district court's distribution of property presents a finding of fact, which we will not reverse unless the court's findings are clearly erroneous. *Rebel*, at ¶ 9. The district court's choice between two permissible views of the evidence is not clearly erroneous. *Id.* On appeal, we do not reweigh conflicts in the evidence and will not reverse because we may have viewed the evidence differently. *Id.* We give "due regard" to the district court's opportunity to judge the witnesses' credibility. *Id.*

### III

[¶ 10] Helen Rebel argues the district court erred in its distribution of the marital estate by making an inequitable allocation of the property to Rodney Rebel. She essentially argues the court erred as a matter of law when it considered liquidation of the assets to reduce Rodney Rebel's monetary payments to pay her. She further contends the court erred in its factual findings that there was evidence a liquidation would have to occur if a higher cash payment were required.

[¶ 11] Generally, "North Dakota law does not mandate a set formula or method to determine how marital property is to be divided; rather, the division is based on the particular circumstances of each case." *Holden v. Holden*, 2007 ND 29, ¶ 10, 728 N.W.2d 312. We have recognized on numerous occasions "the importance of preserving the viability of a business operation like a family farm," *Eberle v. Eberle*, 2010 ND 107, ¶ 20, 783 N.W.2d 254 (quoting *Gibbon v. Gibbon*, 1997 ND 210, ¶ 7, 569 N.W.2d 707), and "liquidation of an ongoing farming operation or business is ordinarily a last resort." *Eberle*, at ¶ 20 (quoting *Gibbon*, at ¶ 7); *see also Holden*, at ¶ 14; *Kostelecky*, 2006 ND 120, ¶ 13, 714 N.W.2d 845.

[¶ 12] This Court has therefore upheld distributing farm assets to one spouse and awarding an offsetting monetary payment to the other. *Eberle*, 2010 ND 107, ¶ 20, 783 N.W.2d 254; *Gibbon*, 1997 ND 210, ¶ 7, 569 N.W.2d 707. We have explained preserving the family farm is a laudable purpose, to be achieved without detriment to the other party, but should not be done at all costs so as to engulf all other factors. *See Marschner v. Marschner*, 2001 ND 4, ¶¶ 17–18, 621 N.W.2d 339; *Linrud v. Linrud*, 552 N.W.2d 342, 346 (N.D.1996). We have also made clear, however, that "its purpose is to avoid 'the potential for economic hardship' if the farm is divided or sold." *Marschner*, at ¶ 18 (quoting *Gibbon*, at ¶ 7).

[¶ 13] Helen Rebel argues that the district court erred as a matter of law in considering any tax consequences of a liquidation and erred in its factual findings that there was evidence liquidation would be certain to occur.

[¶ 14] We have recognized potential taxation matters are part of the pragmatic effects of a marital property division that a district court should consider when it is "properly informed." *Conzemius v. Conzemius*, 2014 ND 5, ¶ 18, 841 N.W.2d 716; *Wald v. Wald*, 556 N.W.2d 291, 294 (N.D.1996). In *Linrud v. Linrud*, 1998 ND 55, ¶ 15, 574 N.W.2d 875, this Court explained that consideration of tax consequences should be limited and reiterated four factors for the district court to consider:

> While we acknowledge that *a properly informed trial court must consider tax effects in a divorce,* the tax consequences should only be considered when the liability is certain to occur within a short time following the dissolution. *Kaiser v. Kaiser*, 474 N.W.2d 63, 69 (N.D.1991); *see also Wald v. Wald*, 556 N.W.2d 291, 294 (N.D.1996); *Fisher [v. Fisher]*, 1997 ND 176, ¶ 35, 568 N.W.2d 728. In *Kaiser*, we stated,
>
>> "[A] trial court in a divorce action should consider potential taxes in valuing marital assets only if (1) the recognition of a tax liability is required by the dissolution or will occur within a short time; (2) the court need not speculate about a party's future dealing with the asset; (3) the court need not speculate about the possible future tax consequences; and (4) the tax liability can be reasonably predicted."

*Linrud*, at ¶ 15 (quoting *Kaiser*, at 69–70) (emphasis added). Nevertheless, we have also said a district court should alter its property distribution when it concludes an adverse tax consequence would result that could be avoided by a different equitable property allocation. *Conzemius*, at ¶ 18; *Kaiser*, at 69; *Gronneberg v. Gronneberg*, 412 N.W.2d 84, 92 (N.D.1987).

[¶ 15] Here, the district court found that the amount of the net marital estate was misleading and considered whether equitable liquidation was possible without liquidation:

> Neither Rodney nor Helen advocate liquidation, but in the Court's assessment the issue is whether an equitable division is possible without liquidation. Helen requests part of the farm land and argues that the farm operation would still be feasible and cash flow for Rodney if she were awarded the land she is requesting.

Helen's assertion flies in the face of the testimony of Rodney's banker Dale Sayler, Vice President of Dakota Community Bank of Hebron, North Dakota, who has been working with Rodney for over 20 years. Mr. Sayler testified he was familiar with Rodney's farm operation and financial situation. In Mr. Sayler's opinion if the operation were split, either land, machinery or livestock, the farm would no longer cash flow. The present "efficiencies of scale" would be lost according to Sayler.

Mr. Sayler also testified in regard to various cash flow projections. Defendant's Exhibits "C through H." Mr. Sayler pointed out that some of those projections that would not cash flow in 2011 would now cash flow based on the May 2, 2012 values. One item of note was a crop insurance check for $86,458.00 which turned out to be more than anticipated (Plaintiff's Exhibit # 44). This was applied to reduce Rodney's loan balance on January 24, 2012. Mr. Sayler testified that in his opinion Rodney could cash flow a $400,000.00 to $500,000.00 cash payment depending on the variables. The variables would be the length of time to pay off, the interest rate, and, of course, commodity prices. He also testified that he used a 5% interest rate in his projection because

that was the going rate in the fall of 2011. Implicit in Mr. Sayler's testimony was that any amount over $500,000.00 would be very difficult for Rodney to cash flow and likely force him to liquidate.

[¶ 16] The district court found Rodney Rebel deserved the opportunity to preserve the family farm and his livelihood by making a cash payment to Helen Rebel. The court found because of the certainty of the tax consequences and expenses of sale that would result if the court ordered him to make a cash payment in excess of a sum which the current farming operation could "cash flow," that the cash pay out amount needed to be adjusted accordingly. The court then considered the testimony of accountant Keith Anderson in reaching an equitable cash payment amount:

> Mr. Anderson testified that because of the nature of the assets awarded to Rodney if he were forced to liquidate taxes and expenses of sale would result in reduction in his equity of about 38%. (Defendant's Exhibit "VV"). In contrast, in regard to the assets awarded to Helen there would be no or little liquidation costs. The sale of her residence would not be taxable nor were any other tax consequences brought to the attention of the Court in regard to the property she requested.

> After reducing the net marital estate awarded to Rodney by 38% Rodney's equity would be $1,070,966.38 ($1,727,-365.13 × 38% = $656,398.75) ($1,727,-365.13 − $656,398.75 = $1,070,966.36). Adding this amount to the assets awarded to Helen results in a total of $1,337,687.55 ($1,070,966.36 + $266,721.17 = $1,337,687.55). Dividing this amount by two results in $668,843.78 which is the approximate amount of an equal distribution after a forced liquidation. Subtracting what

Helen has already received from this amount leaves a balance due to Helen of $402,122.61.

> This amount ($402,122.61) is remarkably close to the balance owed by Rodney under the Judgment entered in this action on May 2, 2012. In accordance with [the prior judge's] decision Helen was awarded a cash payment amount of $512,534.78. After paying 20% or $102,506.00 down, Rodney was left with a balance owing of $410,207.00.

> In this Court's view, $410,207.00 is a fair and equitable cash settlement payment amount and is re-affirmed and adopted as the decision of this Court. Although this represents an increase of just over $8,000.00 ($410,207.00 − $402,122.61 = $8,084.39) in order to be the same as the cash amount owing after the down payment under [the prior judge's] decision, the Court finds this adjustment to be equitable and appropriate. The primary reason in the 38% figure representing taxes and costs of sale is an approximation and not an exact number. A second reason for the upward adjustment is that in this Court's view [the prior judge] was not presented with the proper evidence and therefore did not take into account or explain the tax consequences and costs of sale of liquidation. Helen therefore should not be penalized and receive less than what she would be entitled to under [the prior judge's] decision. [The previous decision] was reversed in part, because [the court] did not adequately explain the reasons justifying a disparity or unequal division. This Court does not find the above division as unequal or [in]equitable because this Court finds that if any higher cash payment amount is ordered, Rodney's farm operation will not cash flow. The Court finds that this would certainly lead to liquidation and

the adverse tax consequences and sale costs associated with liquidation.

The district court also found that Helen Rebel had stated her preference for a cash buy out even though she may obtain less, that she acknowledged there would be tax consequences if the farm were liquidated, and that she acknowledged it would be fair to consider tax consequences when determining her share.

[¶ 17]   Helen Rebel contends that while the district court found the net value of the marital estate was $1,994,086.30, the court erred as a matter of law in allocating the property after reducing the value of the net marital estate awarded to Rodney Rebel by thirty-eight percent. She argues "phantom" tax consequences are not relevant when considering a relevant basis for dividing marital property. She argues that the district court failed to analyze the tax consequences under the *Linrud* and *Kaiser* factors and erroneously considered a "hypothetical" tax consequence. She further asserts there was no testimony Rodney Rebel would have to liquidate the assets of the farm if he were required to make payments to equalize the allocation or pay her one-half of the assets. She argues the court speculated regarding the tax consequences of liquidating the farming and ranching operation.

[¶ 18]   Helen Rebel also argues the district court clearly erred in finding that any payment to her over $500,000 would result in liquidation of the farm assets. She had requested she receive two sections of land, in addition to the other property she ultimately was awarded, which she asserts was not traditional "Rebel" land and would have allowed for nearly an equitable allocation. She asserts none of Rodney Rebel's witnesses testified any of her proposed allocations would result in a liquidation of assets, and he bears the burden of proving a liquidation would result from an equitable allocation of the assets and debts. She argues that although the court implicitly found liquidation based on the testimony of Rodney Rebel's banker, no evidence supports that finding. She contends, therefore, the district court factually erred and its distribution was clearly erroneous.

[¶ 19]   Rodney Rebel responds, however, that the district court's distribution of the marital estate was not clearly erroneous and the court did not err in considering the tax consequences of a liquidation of the parties' farm and ranch assets. He argues the court's property distribution was fair and equitable under the circumstances. He contends neither he nor Helen Rebel advocated for the liquidation of the farm and ranch and the court did not "speculate" about possible future tax consequences because the tax liability was reasonably predicted. He asserts that the court knew he wanted to be able to continue to farm and ranch, passing it on to his children, and the court realized the tax liability and other liquidation costs were bound to occur if it did not consider the tax consequences in the equitable distribution.

[¶ 20]   In its analysis, the district court essentially provides alternate rationales for deciding that the unequal distribution of assets is in fact equitable. On one hand, the court found the distribution roughly equal if the value of the property—largely related to the farm operation awarded to Rodney Rebel—was reduced in value by thirty-eight percent for liquidation. On the other hand, the court was also persuaded by the testimony of Rodney Rebel's banking expert that the farm operation could only "cash flow" a payment of approximately $400,000 to $500,000. Relying on these alternate rationales, the court reaffirmed and adopted the remaining cash payment of $410,207 as fair and equitable. The court did this despite the payment

being greater than what the court's alternate calculation would have been in light of the "liquidation" discount. Nonetheless, the court adopted the "higher" number based on what the prior district court judge had awarded before remand.

[¶ 21] Although Helen Rebel disagrees with the district court's factual inferences, there is evidence in the record to support the court's findings, and we will not reweigh the evidence or reassess the credibility of the witnesses. We conclude the district court has adequately explained its distribution of the marital property. We are not left with a definite and firm conviction the court made a mistake in distributing the parties' marital property, and we conclude the court's distribution is not clearly erroneous.

### IV

[¶ 22] Helen Rebel asserts the district court made a simple mathematical error in its addition regarding the amount of the parties' farm assets. She asserts the total amount of the farm machinery and equipment should have been $346,810, and there was a $27,745 error in Rodney Rebel's favor. Rodney Rebel contends, however, the district court did not make a $27,745 error in calculating the value of the parties' machinery and equipment because Helen Rebel has overlooked the fact that the court adjusted the value of those items for depreciation.

[¶ 23] Here, the district court found the total value of the parties' machinery and equipment was $346,810, but made a specific finding regarding its computation for the depreciation of those assets based on the evidence presented on remand:

In his updated appraisal, Mr. Dvorak included an 8% depreciation deduction. This deduction was based on a 16% average depreciation for tax purposes for one year. The amount of 8% represents one-half a year or the approximate time from the first trial to the entry of the Judgment of divorce. The Court accepts this adjustment and calculates the 8% deduction as $27,744.80 ( [$]346,-810.00 × 8% = $27,744.80). After subtracting this amount from $346,810.00 this Court finds the value of the parties' machinery and equipment to be $319,065.20 on May 2, 2012, the date of the divorce.

[¶ 24] On this record, we conclude the district court findings explain its computation regarding depreciation and the court did not clearly err regarding the amount of the parties' farm machinery and equipment.

### V

[¶ 25] Helen Rebel argues the district court failed to award proper interest on the delayed cash payments she was awarded. She contends the court should have awarded interest at the judgment interest rate of 6.5 percent under N.D.C.C. § 28–20–34.

[¶ 26] When a marital property distribution includes periodic cash payments from one spouse to another, the district court has broad authority to provide for the payment of interest to achieve an equitable distribution of the property. *Adams v. Adams*, 2015 ND 112, ¶ 19, 863 N.W.2d 232; *see also Dick v. Dick*, 434 N.W.2d 557, 559 (N.D.1989); *Klitzke v. Klitzke*, 308 N.W.2d 385, 390 (N.D.1981); *Rudel v. Rudel*, 279 N.W.2d 651, 656 (N.D. 1979). A court is not limited to awarding interest at the legal rate under N.D.C.C. § 47–14–05, but may award interest at any appropriate rate, beginning on any appropriate date. *Dick*, at 559. "When a district court *may* do something, it is generally a matter of discretion." *Buchholz v. Buchholz*, 1999 ND 36, ¶ 11, 590 N.W.2d

215. A district court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner, or when its decision is not the product of a rational mental process leading to a reasoned determination: *Krueger v. Grand Forks Cty.*, 2014 ND 170, ¶ 13, 852 N.W.2d 354. "The party seeking relief must show that the court positively abused its discretion and not that the court made a 'poor' decision." *Id.*

[¶ 27] Helen Rebel argues that, although the district court awarded interest at a rate of 4.5 percent, testimony at trial showed the bank's interest rate was 5 percent and judgment interest was approximately 6.5 percent. She contends that because she is "financing" Rodney Rebel over the course of more than ten years, she should also be entitled to receive her interest at the same rate as the judgment interest rate. Rodney Rebel argues the court did not err in awarding interest on the delayed cash payments and her reliance on N.D.C.C. § 28–20–34 and *Dick*, 434 N.W.2d 557, is misplaced.

[¶ 28] In *Dick*, 434 N.W.2d at 559, this Court held that the district court "may award interest at any appropriate rate, commencing on any appropriate date, or may deny interest altogether." However, as we have noted in ¶ 8, periodic cash payments without interest awarded as part of a property distribution must be discounted to present value when determining whether the distribution is equitable. This Court in *Dick* also explained when N.D.C.C. § 28–20–34 properly applies:

> If, however, the judgment contains no reference to interest on a monetary award constituting division of property, Section 28–20–34, N.D.C.C., comes into play, and the award draws interest at the statutory rate for judgments. We further conclude that, where the trial court specifies a future date when a lump sum payment is due, interest accrues on the judgment from that date. This is consistent with the general rule that interest on unpaid installments of alimony accrues on the date they become due.

*Dick*, at 559 (citations omitted).

[¶ 29] Here, the amended judgment provides for interest on the monetary award to Helen Rebel. The district court compromised between the parties' interest rate proposals, concluding 4.5 percent was a fair and appropriate rate. The court required Rodney Rebel to pay interest of 4.5 percent on the remaining cash award of $410,207, retroactive to May 2, 2012. As discussed, the district court has discretion to award interest at any appropriate rate commencing at any appropriate date. Based on our review of the record, we conclude the district court did not abuse its discretion.

## VI

[¶ 30] We have considered Helen Rebel's remaining arguments and conclude they are either unnecessary to our decision or without merit. The amended judgment is affirmed.

[¶ 31] DALE V. SANDSTROM, DANIEL J. CROTHERS and LISA FAIR McEVERS, JJ.

KAPSNER, Justice, dissenting.

[¶ 32] I respectfully dissent.

[¶ 33] After trial, the district judge originally assigned to the case found:

> Both parties have enjoyed a modest standard of living. Rodney has worked on the Rebel farm all his life. Helen worked on the farm, briefly, and then was employed in town. Both parties' income and effort contributed to the increase in the marital estate.

The circumstances and necessities of each are equal. Both parties have worked hard all their adult lives.

At marriage, neither party owned any substantial property. The efforts of both have resulted in a substantial marital estate. The marital estate is almost entirely tied to the farming and ranching activities.

[¶ 34] Despite their joint efforts, Rodney Rebel leaves this marriage with net property of $1,727,365, the use of which he enjoys immediately. Helen Rebel leaves this marriage with net property of $266,721 now and an additional $410,207, the full enjoyment of which is deferred for seventeen years, at an interest rate that is less than described by the district court, and which bears the uncertainty that Rodney Rebel will fulfill his obligations to pay her. Helen Rebel's affair and Rodney Rebel's desire to farm land, which derived from his family, do not support this disparity. The justifications offered to support this disparity violate principles announced in our caselaw. Further, the testimony offered by both Rodney Rebel and his banker on remand would support a different result.

[¶ 35] The majority opinion, at paragraph 3, recites the directions of the majority opinion, in remanding the case, that the source of the property was not a sufficient reason for this disparate allocation when both spouses were purchasers and both contributed to the increase of the estate. However, the majority now seems to accept the "phantom arithmetic" of the district court that allows a liquidation that is never going to happen to justify the disparity. This "phantom arithmetic" is quoted at length in paragraph 16 of the majority opinion to justify the ultimate number that the district court orders as a payment to Helen Rebel.

After reducing the net marital estate awarded to Rodney by 38% Rodney's equity would be $1,070,966.38 ($1,727,365.13 × 38% = $656,398.75) ($1,727,365.13 − $656,398.75 = $1,070,966.36). Adding this amount to the assets awarded to Helen results in a total of $1,337,687.55 ($1,070,966.36 + $266,721.17 = $1,337,687.55). Dividing this amount by two results in $668,843.78 which is the approximate amount of an equal distribution after a forced liquidation. Subtracting what Helen has already received from this amount leaves a balance due to Helen of $402,122.61.

In fact, the taxes and costs of a forced liquidation, the 38% computed by the district court, are never going to occur as a result of this distribution. This phantom arithmetic is a mental exercise that benefits only Rodney Rebel to the detriment of Helen Rebel. Given the legally false premise on which it is based, the district court's finding that "$410,207.00 is a fair and equitable cash settlement payment amount" is clearly erroneous.

[¶ 36] Our caselaw has indicated that "phantom tax consequences are not a relevant basis on which to divide marital property. While we acknowledge that a properly informed trial court must consider tax effects in a divorce, the tax consequences should only be considered when the liability is certain to occur within a short time following the dissolution." *Linrud v. Linrud*, 1998 ND 55, ¶ 15, 574 N.W.2d 875 (citing *Kaiser v. Kaiser*, 474 N.W.2d 63, 69 (N.D.1991)).

[¶ 37] In *Kaiser*, we stated:
[A] trial court in a divorce action should consider potential taxes in valuing marital assets only if (1) the recognition of a tax liability is required by the dissolution or will occur within a short time; (2) the court need not speculate about a

party's future dealing with the asset; (3) the court need not speculate about possible future tax consequences; and (4) the tax liability can be reasonably predicted. 474 N.W.2d at 69–70. *See also Conzemius v. Conzemius*, 2014 ND 5, ¶ 19, 841 N.W.2d 716.

[¶ 38] Tax consequences and liquidation costs not only must not be used when they are not going to be incurred; they cannot be used as justification to inequitably reduce the property allocated to one of the spouses who has contributed to the acquisition of the property. It is simply unfair. As the majority notes, a different, but equitable, property allocation that avoids the tax consequences is appropriate. This one is different, but not equitable. Rodney Rebel gets net property of $1,727,365 today; Helen Rebel may get $676,928 at a reduced interest rate in seventeen years.

[¶ 39] What is even more problematic is that both Rodney Rebel and his banker Dale Sayler testified at the hearing on remand that a greater payment was possible, while allowing Rodney Rebel to continue farming. The first judgment entered in this divorce action required Rodney Rebel to pay Helen Rebel $512,534.78, with 20% due within 90 days of entry of judgment and the balance without interest within 36 months of entry of judgment. Rodney Rebel paid $102,506.95, as required by the first judgment, which Helen Rebel was unable to receive in order not to have accepted the benefits of a judgment which she appealed. That amount is held in her attorney's trust account. On remand, his banker, and later Rodney Rebel, were asked by Rodney Rebel's lawyer, whether it was possible to fund an additional $500,000 from the farming operation over the $102,000 on deposit. Both acknowledged that it was. Dale Sayler, the banker, testified:

Q. So what if the Court were to award her an additional 500,000, in addition to the 102,000 that's in a trust account?

A. It possibly could work.

Q. Okay. You're saying, "possibly," not probably?

The banker also offered the possibility that Rodney Rebel had the wherewithal to finance $500,000 against the land, allowing Helen Rebel to be paid immediately and benefitting Rodney Rebel to the extent Helen Rebel would not have any lien on the property.

Q. Okay. What I'm asking is this, is that are you saying that Rodney could borrow that amount of money and have it repaid to the bank over 30, 40 years and then pay Ms. Rebel in cash or is it—it would be structured so that he would be making those payments to her out of those earnings?

A. Yeah. You know, it can be done either way, but the bad thing about if you do it where he's making a payment to Helen every year, I'm sure she would have some kind of lien on the land and what that would cause Rodney is if he would somewhere down the road, run into a little bit of a hiccup which is not uncommon in farming and ranching where loans need to be restructured. Helen would be calling the shots and probably—possibly wouldn't allow that to happen. So it would be better to do somewhat of a—it might be better to do a cash settlement right now, up-front, and over with.

Q. All right. And, in your opinion, is the Rebel farm and ranch operation operating efficiently enough for Rodney to expect that he could go

out and obtain a loan and pay Ms. Rebel the sum of $500,000?

A. I would venture to guess that Rodney could get that done someplace, yes.

Q. Okay. Whether your bank or another bank?

A. Right, yes.

Q. Do you think it would be possible for Mr. Rebel to obtain a loan beyond $500,000 under the current situation?

A. Possibly.

Q. But there's no certainty there?

A. No certain—I mean—no.

[¶ 40] When Rodney Rebel testified, he also testified that he could pay Helen Rebel $500,000, in addition to the $102,000 that has been deposited to the trust account:

Q. Do you have in mind any amount of money that you would be able to afford to pay Helen as her share of an equitable distribution of your marital estate and be able to continue farming and ranching?

A. Yes.

Q. And what is that?

A. For what they—the stuff that they did, it was about $500,000.

Q. All right. Well, you've already paid Helen some money, correct?

A. $102,000, yes.

Q. And would that $500,000 be in addition to that, or—

A. Right. Yeah.

[¶ 41] Rodney Rebel wanted to pay $500,000 over time. This is consistent with the findings of the trial court after the original trial, "based upon the testimony of the parties' banker, Dale Sayler, that the farm has a history as a successful farm with more than sufficient cash flow to service the debt against it and both provide means of support for the parties and allow for reinvestment back into the farm, which has resulted in an increasing value thereof." While the district court must fashion an equitable distribution of property, it cannot be argued that the distribution ordered by the court is equitable when it is less than both the banker and Rodney Rebel argued is possible.

[¶ 42] To some extent, Helen Rebel did want a money payment and wanted Rodney Rebel to continue to farm the land and her own testimony supports the allocation of land to Rodney Rebel and money to Helen Rebel, although she did request that she receive some parcels of land. The district court was hampered at the first trial by appraisals that did not segregate parcels of land so that tax free distributions of land could be made to both parties. Rather, the evidence focused on the problems of reducing or changing the farming operation and concentrated on how much of a cash payment the operation could handle. However, the disparity of the amount ultimately awarded to Helen Rebel cannot be justified, particularly in light of Dale Sayler and Rodney Rebel's testimony on remand.

[¶ 43] Further, the deferment of Helen Rebel's enjoyment is problematic. This case was remanded, in part, because 80% of the $512,534.78 was deferred for three years without interest. The district court on remand extended the time period that Helen Rebel must wait to have her share of the property from three years to seventeen years. The district court purported to offset this delay by awarding Helen Rebel interest at the rate of 4.5%. In fact, payment at the rate of 4.5% amortized over 17 years would require an annual payment of $35,038.89, not $33,530, so the judgment even fails to award Helen Rebel the interest rate that the judgment facially states. Instead, the interest rate on the

property allocated to her is approximately 3.93%.

[¶ 44] Normally, I would reverse and direct the court to fashion an equitable division of property, allowing the district court the greatest latitude to distribute property as it found appropriate. However, in this case, given the lack of evidence about the values of individual parcels of land that would allow tax-free distributions of those parcels to either Helen Rebel or to Rodney Rebel, I have to recognize the trial court was significantly hampered by the lack of evidence it was provided. Therefore, based upon the evidence heard on remand, I would reverse and direct the district court to amend the following paragraphs of the judgment dated January 23, 2015, to read as follows:

■ In addition to the $102,506.95 previously paid, Rodney shall pay to Helen the sum of $500,000 with interest at the rate of 4.5% per annum in 9 equal annual amortized installments of $68,787.24, with the first payment due one year from the date of entry of this Amended Judgment. Should Rodney fail to make any of those payments within 10 days of the date the payment is due, Helen shall have the right to declare the entire balance due and owing.

[6] At his sole election, Rodney is authorized to pay off in full, at any time, whatever amount of the $500,000 that may then remain owing to Helen, without any additional interest or penalty.

■ Until such time as Rodney pays Helen the $500,000, she shall have a judgment lien against him and all of his property including the farm land as security for the balance owing.

■ Rodney shall also be required to pay Helen interest at the rate of 4.5% per annum on the $500,000 from May 2, 2012 when the Judgment was entered, to the date this Amended Judgment is entered. The per diem amount of that interest carried out to four decimal places is $61.6438 per day. This interest payment shall be paid in full immediately upon entry of this Amended Judgment.

I would leave the other paragraphs of the amended judgment as originally entered on January 23, 2015.

[¶ 45] I do not regard the above as an equitable result for a long-term marriage where both parties fully contributed to the acquisition of the marital estate. However, it is more equitable than the order appealed from, it does not accept the improper logic forming the basis of the district court's computation, and it recognizes the realities of the lack of evidence under which the district court had to construct a remedy. Therefore, I respectfully dissent.

[¶ 46] CAROL RONNING KAPSNER